1  STEVEN G. KALAR
   Federal Public Defender
2  DEJAN M. GANTAR
   Assistant Federal Public Defender
3  55 South Market Street, Suite 820
   San Jose, CA 95113
4  Telephone: (408) 291-7753
   dejan_gantar@fd.org
5
6  Counsel for Defendant
7  JONATHAN WELLS

8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                        SAN JOSE DIVISION
11
12 UNITED STATES OF AMERICA,           Case No. 18 Cr. 567 LHK
13             Plaintiff,
14      v.                             DEFENDANT JONATHAN WELLS'
                                       SENTENCING MEMORANDUM; REQUEST
15 JONATHAN WELLS,                     FOR DOWNWARD VARIANCE;
                                       OBJECTIONS TO AND MOTION TO STRIKE
16             Defendant.              VICTIM IMPACT STATEMENTS FROM
                                       PRESENTENCE REPORT; OBJECTIONS TO
17                                     PROPOSED SPECIAL CONDITIONS OF
                                       SUPERVISED RELEASE
18
                                       Date: December 11, 2019
19                                     Time: 9:15 a.m.
                                       Location: Courtroom 8, 4th Floor
20
21                                     Before the Honorable Lucy H. Koh
                                       United States District Judge
22
23
24
25
26
27
28

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ...................................................................................................................1

THE SECTION 3553(a) FACTORS ......................................................................................1

A.    Section 3553(a)(1). ...................................................................................................2

      1.    The history and characteristics of Jonathan Wells....................................2

      2.    The nature and circumstances of the offense. ...........................................4

B.    Section 3553(a)(2). ...................................................................................................5

C.    Sections 3553(a)(3), 3553(a)(4), and 3553(a)(5). ...................................................6

      1.    Statutory provisions. .................................................................................6

      2.    Guidelines provisions and offense level. ..................................................6

      3.    Request for downward variance.................................................................6

D.    Section 3553(a)(6). .................................................................................................12

E.    Section 3553(a)(7). .................................................................................................13

OBJECTIONS TO AND MOTION TO STRIKE VICTIM IMPACT STATEMENTS FROM PRESENTENCE REPORT ...................................................................................................14

OBJECTIONS TO PROPOSED SPECIAL CONDITIONS OF SUPERVISED RELEASE ......15

CONCLUSION......................................................................................................................17

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF AUTHORITIES**

**Cases**

*Kimbrough v. United States*, 552 U.S. 85 (2007) ..............................................................1, 2, 5, 7

*Packingham v. North Carolina*, 137 S. Ct. 1730 (2017) ..............................................16

*Pepper v. United States*, 562 U.S. 476 (2011) ..............................................................1

*United States v. Autery*, 555 F.3d 864 (9th Cir. 2009)..............................................10

*United States v. Barsumyan*, 517 F.3d 1154 (9th Cir. 2008) ........................................16

*United States v. Booker*, 543 U.S. 220 (2005) ..............................................................1

*United States v. Burkholder*, 590 F.3d 1071 (9th Cir. 2010) ........................................14

*United States v. Carignan*, Case No. 15 Cr. 3 (N.D. Cal. 2015) ..............................13

*United States v. Diaz*, 720 F. Supp. 2d 1039 (E.D. Wis. 2010)..............................8, 13

*United States v. Dorvee*, 604 F.3d 84 (2d Cir. 2010)..............................................8, 13

*United States v. Dunning*, 857 F.3d 342 (6th Cir. 2017) ..............................................4

*United States v. Grober*, 624 F.3d 592 (3d Cir. 2010)..............................................13

*United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011)..............................................7, 8

*United States v. Henderson*, Case No. 15 Cr. 565 (N.D. Cal. 2015) ..............................12

*United States v. Holena*, 906 F.3d 288 (3d Cir. 2018)..............................................16

*United States v. Koff*, Case No. 14 Cr. 270 (N.D. Cal. 2014) ..............................13

*United States v. LaCoste*, 821 F.3d 1187 (9th Cir. 2016) ..............................................16

*United States v. Orobchenko*, Case No. 18 Cr. 253 (N.D. Cal. 2015)..............................12

*United States v. Paul*, 561 F.3d 970 (9th Cir. 2009)..............................................10

*United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) ..............................................12

*United States v. Quinzon*, 643 F.3d 1266 (9th Cir. 2011)..............................................15

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ..............................................12

*United States v. Vincent*, Case No. 15 Cr. 196 (N.D. Cal. 2015) ..............................13

*United States v. Weber*, 451 F.3d 552 (9th Cir. 2006)..............................................15

**Statutes**

18 U.S.C. § 2252 ................................................................................................1, 6

18 U.S.C. § 3553 ............................................................................................1, 2, 12

18 U.S.C. § 3583 ...................................................................................................15

18 U.S.C. § 3771 ...................................................................................................14

**United States Sentencing Guidelines**

U.S.S.G. § 2G2.2 .....................................................................................................8

**Other Authorities**

Harry J. Holzer, *et. al.*, *Will Employers Hire Ex-Offenders? Employer Preferences, Background Checks, and Their Determinants*, Berkeley Program on Housing and Urban Policy, Working Paper Series (2001) ................................................................................11

U.S. Sentencing Comm'n, 2012 Report to the Congress: Federal Child Pornography Offenses (2012) ................................................................................4, 8, 9

U.S. Sentencing Comm'n, Quick Facts, Child Pornography Offenders (2018) ...........................9

**INTRODUCTION**

Defendant Jonathan Wells, by and through his counsel, respectfully submits the following Sentencing Memorandum.

Mr. Wells comes before the Court having pleaded guilty to one count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b)(1).  Probation calculates an advisory Guidelines range of 121-151 months, and recommends a downward variance to a sentence of 71 months.  Presentence Report ("PSR") ¶ 108; PSR Sentencing Recommendation at 1.  Mr. Wells anticipates the Government will recommend a sentence on the low-end of the Guidelines.

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and the 18 U.S.C. § 3553(a) factors, Mr. Wells respectfully asks the Court to impose a sentence of 60 months imprisonment, followed by five years supervised release ("the recommended sentence").  The recommended sentence is "sufficient, but not greater than necessary" to account for Mr. Wells' circumstances, and his conduct and role in this case.  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

**THE SECTION 3553(a) FACTORS**

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).  "Underlying this tradition is the principle that the punishment should fit the offender and not merely the crime."  *Id.*

The Court is thus charged to "impose a sentence sufficient, *but not greater than necessary*, to accomplish the goals of sentencing, including to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford

adequate deterrence to criminal conduct, and to protect the public from further crimes of the

defendant." *Kimbrough*, 552 U.S. at 101 (quotation marks omitted; emphasis added); *see also*

18 U.S.C. § 3553(a).  Mr. Wells thus address the relevant section 3553(a) factors in turn, so that

the Court may make an individualized assessment of the appropriate sentence.

**A.      Section 3553(a)(1).**

Section 3553(a)(1) directs the Court to evaluate "[t]he nature and circumstances of the

offense and the history and characteristics of the defendant."

**1.      The history and characteristics of Jonathan Wells.**

Jonathan Wells comes before the Court as a 47-year-old man from Soquel, California.

PSR ¶ 73.  Mr. Wells was born to a modest working-class family and raised in San Andreas and

Chico, California.  PSR ¶ 75.  His family life growing up was largely stable and intact,

however, Mr. Wells' father was an alcoholic who was often absent and emotionally distant with

his children, and who on occasion physically abused them.  *Id.*  As a result, Mr. Wells grew up

very close to his mother, with whom he is still close today.  *See* Ex. A, Wells Letter.

Growing up, school life was difficult for Mr. Wells.  A self-described "introvert," he was

diagnosed with learning disabilities while in elementary school, and enrolled in special

education classes.  PSR ¶ 93.  "Quiet and shy[,]" Ex. A., Huggins Letter, he struggled to make

friends, and was bullied.  PSR ¶ 93.  While it's not uncommon for children to struggle with the

complex social dynamics present in grade school, for Mr. Wells that unfortunate struggle may

have been the result of a disturbing sexual assault he experienced when he was very young:

when he was in the second grade, an older student walked in on him while he was using the

bathroom, pulled down his pants, and performed oral sex on him.  PSR ¶ 75**.**

2

It need not take an expert to identify the obvious link between Mr. Wells' assault and the school-life struggles described above that he experienced immediately thereafter—indeed, Mr. Wells repeated the second grade, became an "introvert" because of the assault, and always struggled making friends and maintaining relationships.  PSR ¶ 50, 93.

After high school, Mr. Wells received an Associate of Arts degree, and a few years later, began a gainful history of employment primarily as a union sheet metal worker.  PSR ¶ 92, 97-102.  That career abruptly ended upon his arrest for the instant offense; after his employer learned of the arrest, Mr. Wells lost his job, and has remained unemployed since.  PSR ¶ 98.  Since then, Mr. Wells has lived alone in his mother's home in Soquel, which is where he has resided most of his life.

Those closest to him describe Mr. Wells as a "very kind" person with a "big heart."  Ex. A, Letters of Support.  His mother and great aunt describe him as "[s]oft spoken, gentle and kind[,]" and always willing to give others a helping hand.  *Id.*  And that kindness appears more innate than taught, something that Mr. Wells has possessed since he was young.  His mother describes examples of how, when Mr. Wells was in the third grade, he always wanted to help a blind teacher that he admired, and that during the aftermath of the 1989 Lomo Preita Earthquake, when Mr. Wells was a teenager, he canvassed the neighborhood, and helped neighbors deal with the fallout, including turning off their gas, and cleaning the destruction in their homes.  Ex. A., Wells Letter.

In recent years, Mr. Wells has become a significant caretaker for his mother, who suffers from various health issues.  *Id.*  His mother is grateful for the support in the time of her failing health—he would often make the four-hour drive to her home in Chico, and help with various house chores and other basic life needs.  PSR ¶ 83-84.

Mr. Wells has led a simple and quiet life.  One that has been committed to work, and in more recent years, caring for his mother.  One that, aside from the instant offense, has been completely free of criminal indiscretions.  He has lost his job, or worse—his career—as a result of this offense, but nonetheless hopes to complete his sentence, find employment, and continue helping his mother.   In sum, Mr. Wells respectfully contends that the foregoing supports imposition of the recommended sentence.

2.       **The nature and circumstances of the offense.**

Section 3553(a)(1) also directs the Court to evaluate the nature and circumstances of the offense.  The instant offense is a "mine-run" possession of child pornography case: Mr. Wells used a peer-to-peer file sharing program ("eMule") to download child pornography images from other users on the internet.  PSR ¶¶ 6-13.[1]  On April 28, 2016, the Santa Cruz Police Department searched Mr. Wells' home, and recovered several digital devices that later revealed to contain images of child pornography.  PSR ¶¶ 13-14.  That same day, Mr. Wells was interviewed by state law enforcement.  Mr. Wells was cooperative during the interview, during which he confessed to downloading child pornography.  PSR ¶ 16.[2]

---

[1] The fact that Mr. Wells was convicted of "receipt" rather than "possession" is of little consequence.  Indeed, the distinction in most cases—as it is here—is one without a difference. The United States Sentencing Commission has urged Congress to treat the two offenses the same, finding "[t]here is no rational basis to treat receipt offenses . . . and possession offenses . . . differently[.]"  U.S. Sentencing Comm'n, 2012 Report to the Congress: Federal Child Pornography Offenses (2012), available at: https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf; *see also United States v. Dunning*, 857 F.3d 342, 351 (6th Cir. 2017) (Merritt, J., Dissenting) (explaining that the distinction in severity of punishment between "possession" and "receipt" is irrational).

[2] Mr. Wells was first charged for the instant offense in Santa Cruz County Superior Court.

4

Importantly, Mr. Wells did not personally share or re-distribute the images he downloaded, or produce child pornography himself.  So too, the Government does not allege that Mr. Wells ever contacted (or attempted to contact) any minors, or that he ever belonged to any online community that shared or exchanged child pornography.  And he didn't use sophisticated or advanced technology to commit the offense: he used a freely available file sharing network to obtain the images, and made no attempt to anonymize his IP address or otherwise evade law enforcement by masking his activities.  In sum, the instant offense is an unremarkable possession of child pornography case—charged and pled to as a "receipt"—that resembles the majority of contemporary child pornography offenses.

In sum, Mr. Wells respectfully contends that the section 3553(a)(1) factors support imposition of the recommended sentence.

**B.    Section 3553(a)(2).**

Section 3553(a)(2) directs the Court to evaluate a sentence sufficient to "(A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  As the Supreme Court in *Kimbrough* made plain, the Court should fashion "a sentence sufficient, but not greater than necessary" to meet these goals.  552 U.S. at 101.

The recommended sentence will satisfy section 3553(a)(2)'s directives.  Similar offenders have been sentenced to terms akin to the recommended sentence.  *See* Part D, *infra*.  Moreover, Mr. Wells' performance while on pretrial release (which effectively began in April 2016, when the Santa Cruz County District Attorney's Office filed criminal charges against him)

5

combined with the strict conditions of supervised release, indicates he is unlikely to reoffend, and the recommended sentence will provide adequate deterrence.  Mr. Wells respectfully submits that the recommended sentence is "sufficient, but not greater than necessary" to satisfy each of the section 3553(a)(2) factors.

**C.      Sections 3553(a)(3), 3553(a)(4), and 3553(a)(5).**

Sections 3553(a)(3) through (a)(5) direct the Court to assess the kinds of sentences available statutorily and pursuant to the United States Sentencing Guidelines, as well as the policy statements and amendments issued by the United States Sentencing Commission ("USSC").  This section gives effect to *Kimbrough*'s directive for this Court to consider the advisory Guidelines like the rest of the section 3553(a) factors.

**1.      Statutory provisions.**

Mr. Wells is subject to a term of incarceration up to 20 years, and a mandatory minimum of five years.  18 U.S.C. § 2252(a) & (b)(1).

**2.      Guidelines provisions and offense level.**

Mr. Wells' total offense level is 32, and with no criminal history, he falls into Criminal History Category I.  PSR ¶ 108.  The resulting advisory Guidelines range is 121-151 months.  *Id.*

**3.      Request for downward variance.**

Notwithstanding the advisory guidelines in this case, Mr. Wells respectfully asks this Court vary downward and impose a sixty-month sentence for the following reasons.

**a.      The child pornography guidelines are inflated, lack empirical support, and overstate the seriousness of the offense.**

"[T]he child pornography Guidelines are, to a large extent, not the result of the [USSC's] exercise of its characteristic institutional role, which requires that it base its determinations on empirical data and national experience, but of frequent mandatory minimum legislation and

6

specific congressional directives to the Commission to amend the Guidelines." *United States v. Henderson*, 649 F.3d 955, 962-63 (9th Cir. 2011) (internal quotations omitted). In *Henderson*, the Ninth Circuit made clear that district courts may "depart from [the child pornography Guidelines] based on reasonable policy disagreement[.]" *Id.* at 960. In so holding, the Court summarized the child pornography Guidelines' history, emphasizing that they had "been substantively revised nine times during their 23 years of existence . . . [and that] [m]ost of the revisions *were Congressionally-mandated and not the result of an empirical study*." *Id.* at 963 (emphasis added).[3] Judge Berzon concurred "only to emphasize that unjust and sometimes bizarre results will follow if § 2G2.2 is applied by the district courts without a special awareness of the Guidelines anomalous history." *Id.* at 964 (Berzon, J., concurring). Put simply, the child pornography Guidelines have been substantively amended multiple times since their inception, each time resulting in harsher penalties, and the majority of those changes were congressionally mandated, rather than the result of empirical studies. *Id.* at 962.

The advisory Guidelines are meant to "reflect a rough approximation of sentences that might achieve [section] 3553(a)'s objectives" because they are based on the USSC's expert evaluation of empirical data and national experience. *Kimbrough*, 552 U.S. at 109. But when the Guidelines do not reflect the USSC's expertise, and are instead—like here—based on Congressional directives, they are less likely to advise a sentence that satisfies section 3553(a), even in the "mine-run" case. *Id.*

This is a "mine-run" case. Yet, the applicable specific offense adjustments under the Guidelines are illogically harsh. Moreover, they're hardly "specific offense adjustments" at all:

---

[3] The USSC has openly resisted these Congressional directives. For example, the USSC questioned the computer-use enhancement (adopted according to statutory mandate), because it would apply broadly, and without any distinction between offenders who used a computer to widely disseminate child pornography and those who simply possessed it. *See id.* at 961.

as Judge Berzon recognized, they apply in virtually every child pornography case. "Enhancements for the use of a computer, depictions of prepubescent minors, portrayal of sadistic or masochistic conduct and the involvement of over 600 images—all . . . apply in a majority of cases and some of [them] apply in more than 90% of [cases]—[together, they] add up to create an effective base offense level of 31." *Id.* at 965; *see also United States v. Dorvee*, 604 F.3d 84, 96 (2d Cir. 2010) (noting that in 2009, "94.8% involved an image of a prepubescent minor (qualifying for a two-level increase pursuant to § 2G2.2(b)(2)), 97.2% involved a computer (qualifying for a two-level increase pursuant to § 2G2.2(b)(6)), 73.4% involved an image depicting sadistic or masochistic conduct or other forms of violence (qualifying for a four-level enhancement pursuant to § 2G2.2(b)(4)), and 63.1% involved 600 or more images[.]")  Such is the case here, where the specific offense adjustments add up to an "effective base offense level of" 32.  *Henderson*, 649 F.3d at 965.  Indeed, the four specific offense adjustments here result in a 13-point upward swing from an already high base offense level of 22.  PSR ¶¶ 51-64.  Unsurprisingly, "judges across the country have declined to impose sentence[s] within the range [section 2G2.2] recommends."  *United States v. Diaz*, 720 F. Supp. 2d 1039, 1041 (E.D. Wis. 2010) (collecting cases).[4]

And the USSC agrees: in 2012, it released a report ("the report") to Congress on the child pornography guidelines.  The report was "the result of a multi-year process in which the . .

_____

[4] While the child pornography Guidelines are problematic as a result of consistent Congressional mandates, as opposed to empirical studies, the problem is compounded by the fact that the Guidelines are outdated and were promulgated at a time when the typical offender obtained child pornography in printed form in the mail.  U.S. Sentencing Comm'n, 2012 Report to Congress at iii.  As the report notes, "[t]he current sentencing scheme in § 2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior[.]"  *Id.* at xviii.  And P2P "file-sharing programs that were just emerging only a decade ago [] now facilitate large collections of child pornography."  *Id.* at ii; *see also Diaz*, 720 F.Supp.2d at 1042 ("The number of images enhancement is also questionable because, as a result of internet swapping, offenders readily obtain the necessary number of images with minimal effort.")

. Commission [] examined cases of offenders sentenced under the federal sentencing guidelines and corresponding penal statutes concerning child pornography offenses." U.S. Sentencing Comm'n, 2012 Report to the Congress: Federal Child Pornography Offenses (2012) at i, available at: https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf. Sentencing data analyzed by the Commission showed that "a growing number of courts believe that the current sentencing scheme in non-production offenses is overly severe for some offenders." *Id.* at ii.  The report ultimately concluded that the non-production child pornography Guidelines "should be revised to account for recent technological changes in offense conduct and emerging social science research about offenders' behaviors and histories[.]" *Id.* at xvii.  The report advocated for Congressional legislation that would provide the USSC with express authority to accordingly amend the guidelines. *Id.* at xviii.  It thus comes as no surprise that in Fiscal Year 2018, 61.2% of all child pornography offenders received a below-range variance.  United States Sentencing Comm'n, Quick Facts, Child Pornography Offenders (2018), available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Child_Pornography_FY18.pdf.

In sum, Mr. Wells respectfully asks this Court to impose the recommended sentence because the advisory Guidelines are inflated, lack empirical support, and fail to satisfy section 3553(a).

> **b.     Mr. Wells does not have any criminal history and has otherwise led a law-abiding life.**

At age 47, this is Mr. Wells' first criminal offense.  Mr. Wells respectfully contends that this alone warrants a significant downward variance from the 121-151 month range advised by

the Guidelines.  *See United States v. Paul*, 561 F.3d 970 (9th Cir. 2009) (finding that a 15-month

within-Guidelines sentence for theft from a local government was substantively unreasonable, in

part because the defendant had no criminal history).  The Ninth Circuit has expressly held that it

is appropriate for a district court to vary downward on the basis that a defendant completely

lacks criminal history.  *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (finding that

probationary sentence for possession of child pornography was not an abuse of discretion).

Those principles are of import here.  Mr. Wells has no criminal history whatsoever, and

the Guidelines fail to adequately reflect this mitigating factor: "a defendant with a minor

criminal history can still fall within Criminal History Level I."  *Id.*  Put differently, Mr. Wells

falls into CHC I, the same level that a hypothetical offender with *some* criminal history would

fall into; it is therefore appropriate for the Court to vary downward.  *Id.*

And as discussed above, Mr. Wells has led a law-abiding life, aside from his conduct in

this case.  Before the offense, he enjoyed continued gainful employment, and recently has taken

on the important task of caring for his sick mother, which he hopes to continue following his

sentence.  Similarly, Mr. Wells enjoys the continued support of his family, which many

offenders, especially under circumstances similar to those here, do not.   And Mr. Wells has

demonstrated significant strides toward improvement.  For example, Probation notes that he has

successfully performed while on pretrial release, not having suffered a single allegation or

violation.  PSR ¶ 4.  He also attended weekly counseling sessions upon his release, which he has

actively participated in, *id.,* and which Mr. Wells notes has helped him deal with his past.  PSR ¶

89.  Indeed, in October 2018, his counseling sessions were "reduced to bi-weekly due to his

compliance and participating in the last several months."  PSR ¶ 4.  He has candidly expressed

his belief that the offense may be connected to his own sexual assault, and has further expressed his commitment to paying restitution ultimately ordered by this Court.  PSR ¶ 50.

And more recently, Mr. Wells exhibited conduct that displayed a true acceptance of responsibility: in the weeks leading up to sentencing, Mr. Wells' defense counsel arranged for him to retrieve non-contraband material from the Government, seized from his home during the 2016 search.  Inadvertently, HSI agents provided Mr. Wells with discs that appeared to contain child pornography—Mr. Wells immediately informed defense counsel, who arranged to have the contraband material returned to the Government forthwith.  Mr. Wells' behavior demonstrates a significant acceptance of responsibility for the offense, and further supports imposition of the recommended sentence.

### c.    Mr. Wells will suffer lifetime collateral consequences as a result of the instant offense, namely, loss of employment and sex offender registration.

The Court is well aware that individuals convicted of felonies struggle to secure and maintain gainful employment long after their release from prison as a result of the general reluctance of private employers to hire ex-convicts.  Harry J. Holzer, *et. al.*, *Will Employers Hire Ex-Offenders? Employer Preferences, Background Checks, and Their Determinants*, Berkeley Program on Housing and Urban Policy, Working Paper Series (2001).  And so it is here, where Mr. Wells stands convicted of possessing child pornography—an offense that undisputedly carries considerable lifetime stigma.  As noted above, prior to his arrest for the instant offense, Mr. Wells enjoyed a long and successful career as a union sheet metal worker.  That career has ended as a result of this offense.[5]

Section 3553(a)(2)(A) specifically requires the Court to consider the "just punishment for the offense."  As the Second Circuit has previously noted, "[i]t is difficult to see how a court

---

[5] Of course, Mr. Wells is committed to finding gainful employment after his release. PSR ¶ 82.

can properly calibrate a just punishment if it does not consider the collateral effects of a particular sentence." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (downward variance supported in part on the basis that the defendant would be unable to pursue his career as an academic or translator); *see also United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (holding that the district court's consideration of the defendant's loss of employment and pension as a result of his conviction was appropriate under section 3553(a)).

Compounding the struggle that inevitably awaits Mr. Wells is the requirement that he register as a sex offender, which will inevitably make securing employment more difficult, and limit his general movement.  Mr. Wells respectfully contends that this too the Court must consider pursuant to section 3553(a)'s directive that the sentence reflect the need for "just punishment" and "adequate deterrence."  18 U.S.C. § 3553(a)(2)(A) & (B).

At bottom, the penalty and burden that Mr. Wells will face as a result of this offense flow far beyond the custody term this Court will impose.  For the foregoing reasons, Mr. Wells respectfully asks this Court impose the recommended sentence.

**D.      Section 3553(a)(6).**

Section 3553(a)(6) directs the Court to consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.  Recent child pornography cases arising out of this district show that the recommended sentence would *not* result in an unwarranted sentencing disparity.  *See e.g., United States v. Henderson*, Case No. 15 Cr. 565 (N.D. Cal. 2015) (defendant convicted of receipt of child pornography sentenced to mandatory minimum of 60 months, where advisory Guidelines range was 97-121 months); *United States v. Orobchenko*, Case No. 18 Cr. 253 (N.D. Cal. 2015) (defendant convicted of distributing/possessing child pornography sentenced to 60

months); *United States v. Koff*, Case No. 14 Cr. 270 (N.D. Cal. 2014) (defendant convicted of possessing child pornography sentenced to 39 months where advisory Guidelines range was 78-97 months); *United States v. Carignan*, Case No. 15 Cr. 3 (N.D. Cal. 2015) (defendant convicted of possession of child pornography and possession with intent to distribute methamphetamine sentenced to 60 months, where advisory Guidelines range was 97-121); *United States v. Vincent*, Case No. 15 Cr. 196 (N.D. Cal. 2015) (defendant convicted of possession of child pornography sentenced to 36 months, where advisory Guidelines range was 78-97 months).

And as noted throughout, significant downward variances in non-production child pornography cases, on the basis that section 2G2.2 is not credible, are not unique to this district. *See e.g., United States v. Grober*, 624 F.3d 592 (3d Cir. 2010) (where Guidelines advised 235-293 months, district court sentenced defendant to 60 month mandatory minimum for receipt of child pornography); *Dorvee*, 616 F.3d at 188 (within-guidelines sentence of 240 months for distribution of child pornography held substantively unreasonable, noting that section 2G2.2 is "an eccentric Guidelines of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results."); *see also Diaz*, 720 F. Supp. 2d at 1041 (collecting cases).

**E.      Section 3553(a)(7).**

The last section 3553(a) factor requires the Court to consider "the need to provide restitution to any victims of the offense."  The parties continue to address the amount of restitution in this case, and will jointly request the matter be put over for either resolution or a hearing following sentencing.  Mr. Wells has agreed to pay restitution as ultimately found by this Court.  Thus, this section does not affect the appropriateness of the recommended sentence.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### OBJECTIONS TO AND MOTION TO STRIKE VICTIM IMPACT STATEMENTS FROM PRESENTENCE REPORT

**Objection No. 1:**

Mr. Wells objects to the inclusion of victim impact statements in the PSR, and moves to have them stricken. *See* PSR ¶¶ 26-48. The Crime Victims' Rights Act ("CVRA") gives victims the right to be "reasonably heard at any public proceeding in the district court involving . . . sentencing[.]" 18 U.S.C. § 3771(a)(4). The CVRA does not, however, provide victims the right to have their statements included in a defendant's PSR, and accordingly, such statements should not be included. *United States v. Burkholder*, 590 F.3d 1071 (9th Cir. 2010).

**Objection No. 2:**

In addition to and separate from Objection No. 1, Mr. Wells objects to the inclusion of impact statements written by any non-minor victim's family member. The CVRA provides that for "a crime victim who is under 18 years of age . . . the legal guardians of the crime victim or the representatives of the crime victim's estate, family members, or any other persons appointed as suitable by the court, may assume the crime victim's rights under this chapter[.]" 18 U.S.C. § 3771(e)(2)(B). The CVRA does not permit the inclusion of statements prepared by non-minor victims' families in a defendant's PSR.

The Government has not directly disclosed which individuals described in ¶¶ 24-48 are currently minors, however, it appears several are not. In response to defense objections, Probation has removed from the PSR statements prepared by family members, but only for those victims who submitted their own letters. Probation justifies this election by stating that "child pornography victims in this case are perpetual minors as their images are viewed and circulated on the Internet, regardless of their current age." Addendum to the PSR.

14

Mr. Wells appreciates that the individuals at issue experience trauma by the continued use and viewing of their images, and in no way seeks to diminish that reality.  At issue here, however, is the plain language of the CVRA, which does not authorize inclusion of letters from family members where the victim is no longer a minor.  Probation's position is not supported by the CVRA, and contradicts its plain language.  For these reasons, and those discussed in Objection No. 1, Mr. Wells respectfully objects to the inclusion of these statements and moves to have them stricken.

**OBJECTIONS TO PROPOSED SPECIAL CONDITIONS OF SUPERVISED RELEASE**

"District courts have significant discretion in crafting conditions of supervised release pursuant to 18 U.S.C. § 3583(d)."  *United States v. Quinzon*, 643 F.3d 1266, 1270 (9th Cir. 2011).  "That discretion, however, is not limitless."  *Id.*  Special conditions imposed must reasonably relate to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D); involve no greater deprivation of liberty than is reasonably necessary for the purposes set forth in (a)(2)(B), (a)(2)(C), and (a)(2)(D); and be consistent with any pertinent policy statement issued by the USSC under section 994(a).  18 U.S.C. § 3583(d)(1)-(3).  The Government bears the burden of demonstrating that a discretionary supervised release condition is appropriate.  *United States v. Weber*, 451 F.3d 552, 557-58 (9th Cir. 2006).

Probation recommends the Court impose several special supervised release conditions. PSR Recommendation at 3-5.  Mr. Wells objects to proposed Special Condition Nos. 4 & 6.

Special Condition Nos. 4 & 6 would impose on Mr. Wells blanket prohibitions on, respectively, the use of computers and access to the internet (absent Probation's advance approval).  *Id.* at 3-4.  Mr. Wells objects to both conditions on the grounds they impose greater deprivations of liberty than necessary, and are unconstitutionally vague and overbroad.

15

Moreover, both conditions violate Mr. Wells' First Amendment rights.  And aside from being patently unconstitutional, both conditions appear unenforceable from a practical standpoint.

Put simply, Condition No. 4—requiring Mr. Wells obtain approval before *using* a computer—would require Mr. Wells obtain Probation's approval before completing many basic life tasks, for example, using a personal smartphone to place a phone call or checking the time.  And Condition No. 6—prohibiting all access to the internet without preapproval—is equally improper.  *See United States v. Barsumyan*, 517 F.3d 1154, 1160-61 (9th Cir. 2008); *United States v. LaCoste*, 821 F.3d 1187 (9th Cir. 2016).[6]  The ubiquity of contemporary society's internet use makes it so that Condition No. 6, if imposed, would be an effective ban on internet use.  It would require Mr. Wells to obtain preapproval before accessing the internet *any* time, no matter how benign, or necessary, his purpose.  This would include using an app to check the weather, ordering an Uber, reading the news, or sending a text message.  Aside from their overbreadth, such conditions implicate particularly significant First Amendment interests.  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017) (explaining that internet usage is integral to the exercise of First Amendment rights in today's society).  If the Court finds that an internet restriction is appropriate, it should "sculpt" any restrictions to address Mr. Wells' conduct while allowing him, at a minimum, to do "everyday tasks that have migrated to the internet, like shopping, or searching for jobs or housing," to access websites that "convey[] essential information, like news, maps, traffic, or weather," and to allow him to engage in benign activities, such as "listen[ing] to music."  *Holena*, 906 F.3d at 294.

---

[6] In *LaCoste*, 821 F.3d at 1191-92, the Ninth Circuit explained that the Court had previously upheld total bans on internet use in child pornography cases, but noted that at least five other circuits had refused to do so.  Still, Mr. Wells maintains that a total internet ban is overbroad even if internet usage was integral to the offense.  *United States v. Holena*, 906 F.3d 288, 290-94 (3d Cir. 2018).

At bottom, these broad prohibitions would impose greater deprivations of liberty than necessary, and are unconstitutional and unworkable.  Mr. Wells asks the Court not impose them. Should the Court impose Condition No. 4, it should modify the language to only require preapproval for "possessing" or "owning" a computer, not "using" one.  And if the Court finds imposing Condition No. 6 is appropriate, it should modify it as follows:

> You must not use any computer or device capable of accessing the internet (as defined in 18 U.S.C. § 1030(e)(1)) to visit any non-public portion of any social networking forum offering an interactive, user-submitted network of friends, personal profiles, blogs, chat rooms, or other environment which allows for interaction with others unless, prior to engaging in such activity, you provide your probation officer with your username, password, any other information necessary to allow the probation officer complete and total access to the same non-public portion of such forum that you may access.  "Non-public" includes private messenger functions, hidden blogs, hidden chat rooms, and any other portions of such forums not accessible to the general public. You must not contact a person you know to be under the age of 18 or that a reasonable person would believe to be a child under the age of 18 using any social networking forum.

## CONCLUSION

For the foregoing reasons, Jonathan Wells respectfully asks the Court to impose the recommended sentence.

STEVEN G. KALAR
Federal Public Defender

DATED: December 4, 2019

*/s/ Dejan M. Gantar*
DEJAN M. GANTAR
Assistant Federal Public Defender

Attorneys for Defendant
JONATHAN WELLS

17

# EXHIBIT A

Your Honor:

    I am Nancy Wells, mother of Jonathan Wells. I live in Cohasset, a small community near Chico.

    Growing up Jonathan was always quiet and shy, but he is very kind and has a big heart. Jon has always been quick to help people with all Kinds of Things, at any Time, day or night. Giving a helping hand doing repairs, etc. Jon never hesitates to help anyone. Even in Third grade, he had a big heart. His Third grade Teacher was blind man "Mike," and I remember Jon always wanted to help Mike because he was blind.

    I remember when the 1989 Lomo Prieta earthquake happened, the first Thing Jon did was go around The house and make sure everyone was ok. He The went outside and checked on all the neighbors and turned off everyone's gas, and helped around the neighborhood, including cleaning people's home. I worked in the school district Then and the next day Jon and his brother came to the school with me and cleaned up, fixed bookshelves, etc.

    Because of my health problems, I have gotten to relying on Jon more and more. It is so good for me when he comes and visits. Jon will help with The cooking, cleaning and other general daily activites. I use a walker and cannot lift heavy Things and he always makes sure the floors are cleared so that I don't trip. I also always eat better when he visits because I can't stand in front of the stove for a very long Time. He also helps me get showered and dressed. I've also fallen and hurt myself a few Times in the last few years and Jon always comes up to help out when That has happened. We really enjoy spending time together.

    I understand The charges made against him

and I still support him emotionally and
financially. Jon will come and live with me
after the case is over.

Sincerely,
Nancy E Wells



Your Honor,

I am Jonathan Wells's great aunt, and I write this letter on his behalf. I have known Jon since his birth. When my family moved overseas, we had an annual visit with him and his family until we moved back to the U.S. to Arizona in 1998.  Our families continue to be in contact with one another.

Jon tends to be quiet and reticent, especially in crowds and around new people. He has a dry sense of humor that can be very funny if one pays attention to his infrequent comments. Soft spoken, gentle and kind, I've never known him to say a cruel or unkind thing to or about anyone. When we were home on leave, he would forego his personal comfort by allowing our family to use his room during our visit. He has always helped his parents with tasks, repairs and household projects. Since his father's passing, he continues to visit and help his mother with her "To Do" lists of household jobs that would be hard for her to do on her own.  From all the years I've known him, I know he has a big heart and if asked, he would be happy to help others or us anyway he could.

Yours truly,

Karen Huggins